J-A22011-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.S., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.J.-S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 379 WDA 2023 |

Appeal from the Order Entered March 8, 2023
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000043-2022

BEFORE:  BOWES, J., OLSON, J., and KING, J.

MEMORANDUM BY BOWES, J.:                    **FILED: November 15, 2023**

A.J.-S. ("Mother") appeals from the order entered on March 8, 2023, which involuntarily terminated her parental rights to her child, L.S., born in March 2019.[1]  We affirm.

Mother gave birth to L.S. when she was fourteen years old.  Despite the Allegheny County Office of Children, Youth and Families ("CYF") already being involved with Mother as a child at that time, CYF did not become involved with L.S. until several months later in July 2019, when it was reported that Mother had:  (1) failed to comply with her mental health treatment, (2) brought adult men into her adoptive mother's home, and (3) used marijuana.  A second referral was made to CYF in September based upon additional mental health

_____

[1] In that order, the orphans' court also terminated the parental rights of L.S.'s father, R.L. ("Father").  Father did not contest the termination proceedings and has not appealed to this Court.

concerns for Mother and allegations that she had been leaving L.S. with strangers. CYF conducted investigations on behalf of both L.S. and Mother at that time. In December, a third referral was made after Mother was arrested for simple assault following an altercation with her biological mother in the presence of L.S. CYF attempted to offer in-home services, but Mother declined. Finally, at approximately 11:00 p.m. on December 17, 2019, CYF was contacted because nine-month-old L.S. had been strapped into a car seat and left alone on the front porch of where Father lived.[2] L.S. was examined at the hospital and found to be unharmed.[3] CYF sought and was granted an order for emergency protective custody over L.S., who was then placed into a pre-adoptive foster home, where he remained at the time of the termination hearing.

L.S. was adjudicated dependent based upon concerns with Mother's parental decision-making, instability due to her frequent abscondences from placement, failure to follow up with mental health treatment, and marijuana usage.[4] As a result, Mother was ordered to undergo a mental health and drug and alcohol evaluation, perform random urine screens as instructed, complete parenting classes, enroll in school, have supervised visits with L.S., and

---

[2] Although Father denied being the father of L.S., a test later confirmed his paternity.

[3] Mother simultaneously sought emergency medical care at the hospital, arriving there around 12:30 a.m.

[4] Mother, herself, was simultaneously adjudicated dependent.

comply with in-home services. Subsequently, a referral was made in August 2022, for Mother to partake in intimate partner violence ("IPV") counseling due to her ongoing tumultuous relationship with P.J.

In April 2022, CYF filed a petition to terminate Mother's rights as to L.S. pursuant to 23 Pa.C.S § 2511(a)(2), (5), and (8), based on her failure to complete her permanency goals. The court held a hearing on the termination petition on March 3, 2023.[5] CYF presented the testimony of casework supervisor Mary Zorn and Pressley Ridge treatment coordinator Zoe Baumcratz, as well as Eric Bernstein, Psy.D., who testified as an expert in the field of child psychology. Through their testimony, they relayed that throughout the three years that L.S. has been in placement, Mother: (1) did not complete her goals as to mental health, drugs, parenting, or school; (2) struggled with stability, frequently disappearing from her own placements; and (3) was inconsistent in her visits with L.S.

Mother testified on her own behalf, explaining her actions and prior failure to comply with her permanency goals as being caused by immaturity and not fully understanding the gravity of the situation. She assured the court that she had since gained that maturity and understanding, and that she was prepared to care for L.S. Mother also presented testimony from her behavioral

---

[5] KidsVoice was appointed to represent L.S. as legal counsel during the termination proceedings. **See** Order Appointing Legal Counsel for a Child in a TPR Proceeding, 6/10/22. At the hearing, counsel confirmed that due to L.S.'s young age and his inability to state a preference, there was no conflict between his legal and best interests. **See** N.T. Hearing, 3/3/23, at 228.

therapist, Jasmin Murphy, who conveyed that she began working with Mother in individual therapy sessions in June 2022, and that Mother had made progress in addressing the IPV concerns and attending sessions more regularly.

Following the hearing, the orphans' court issued an order terminating Mother's parental rights as to L.S. pursuant to § 2511(a)(2), (5), (8), and (b). Mother timely filed a notice of appeal and concise statement pursuant to Pa.R.A.P. 1925(a)(2). The orphans' court complied with Rule 1925(a). Mother presents the following questions for our consideration:

> 1. Did the [orphans'] court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and (8)?
>
> 2. Did the [orphans'] court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S. § 2511(b)?

Mother's brief at 6.

Our standard of review for appeals from orders involuntarily terminating parental rights is well-settled:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but it does not require the appellate court to accept the lower court's inferences or conclusions of law. That is, if the factual findings are supported,

we must determine whether the trial court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. However, we must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re Adoption of C.M.*, 255 A.3d 343, 358–59 (Pa. 2021) (cleaned up).

"The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

Termination of parental rights is governed by § 2511 of the Adoption Act and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

Our case law has made clear that under [§] 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [§] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [§] 2511(b): determination of the needs

and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (cleaned up).

Termination is proper when the moving party proves grounds for termination under any subsection of § 2511(a), as well as § 2511(b). *T.B.B.*, *supra* at 395. Mother asserts that CYS failed to establish by clear and convincing evidence the statutory grounds for termination of her parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b). To affirm the termination of parental rights, we need only agree with the orphans' court as to any one subsection of § 2511(a), as well as § 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). We focus our analysis on § 2511(a)(5) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within

a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

First, we address whether the orphans' court abused its discretion by terminating Mother's parental rights pursuant to § 2511(a)(5). Termination under this subsection requires that the moving party prove the following elements:

(1) the child has been removed from parental care for at least six months; (2) the conditions which led to the child's removal or placement continue to exist; (3) the parents cannot or will not remedy the conditions which led to removal or placement within a reasonable period time; (4) the services reasonably available to the parents are unlikely to remedy the conditions which led to removal or placement within a reasonable period of time; and (5) termination of parental rights would best serve the needs and welfare of the child.

*In re B.C.*, 36 A.3d 601, 607 (Pa.Super. 2012) (citation omitted).

- 7 -

Mother argues that she had engaged in treatment throughout L.S.'s placement, demonstrated increased stability, participated in parenting and drug and alcohol services while in a group home at Taylor Diversion, and obtained housing separate from P.J. to alleviate the IPV concerns. *See* Mother's brief at 16-17. Moreover, she asserts that there was "insufficient evidence that [her] mental health prevented [her] from providing basic parental care of L.S." *Id*. at 17.

The parties stipulated that L.S. has been removed from Mother's care for three years. Thus, the first element of § 2511(a)(5) is satisfied. As to the second, third, and fourth elements, we observe that the initial placement was based upon concerns with Mother's parental decision-making, instability, failure to comply with her mental health treatment, and marijuana usage. Subsequently, IPV concerns were added in light of Mother's tumultuous relationship with P.J. The orphans' court determined that Mother was aware of the concerns and because she had not addressed them within a reasonable period, the concerns remained and were unlikely to be remedied. *See* Orphans' Court Opinion, 5/18/23, at 8.

Our review of the certified record bears out the conclusion of the orphans' court and undercuts Mother's claims. In reviewing this matter, we are cognizant of the fact that Mother was a dependent child herself at the same time L.S. was also determined to be a dependent child. In that regard, Mother was placed at Taylor Diversion in July 2020, where she initially did well and was granted unsupervised visits with L.S. However, she abused her home

passes and unsupervised visits, leaving with L.S. at one point for an entire weekend. L.S. was vomiting for one to three days upon his return, due to Mother's failure to address his dietary issues while in her care. After that, Mother returned to supervised visits with L.S. *See* N.T. Hearing, 3/3/23, at 81-82, 113-14. She absconded from Taylor Diversion in December 2020, her whereabouts were unknown, and she had no contact with CYF until February 2021. *Id*. at 82-83. Due to Mother's unavailability in January 2021, the foster parents were made the primary medical decision-makers for L.S. so that he could receive the appropriate care for his increasing medical concerns, including his diagnosis of eosinophilic esophagitis. *Id*. at 79-80.

Once Mother was located again, she intermittently spent time at Taylor Diversion, Family Links, and her adoptive mother's home while simultaneously fleeing from care multiple times. *Id*. at 84-86. CYF ultimately sought an emergency protective order for Mother in late September 2021. She returned to Family Links, gave birth to a second child, and in less than one month absconded again. She contacted CYF in February 2022, to flee from P.J., and entered placement with her adoptive sister in March 2022. *Id*. at 88-89. However, she left that placement and a subsequent one in the following months, and thereafter turned eighteen. Her later reported whereabouts included staying with friends, being homeless, and living with P.J. *Id*. at 91-93, 208-09. According to Mother, at the time of the hearing, she was living in P.J.'s apartment while he was incarcerated, and she would either remain

there when he returned, or move into an as-yet unsecured apartment of her own. *Id*. at 208-12.

CYF explained the resources it attempted to provide to Mother to accomplish her permanency goals. *Id*. at 101-02, 107-08, 110-12, 118-21. However, Mother only participated in schooling when she was placed at Taylor Diversion and during the short period that she was homebound pregnant with her second child. *Id*. at 94, 109-11. She testified that she resumed school in January 2023. *Id*. at 167.

Mother missed most of her drug screens, completing only ten of fifty-six. She complied with recommended treatment while at Taylor Diversion but did not continue once she left. After being evaluated again in June 2022, she was recommended to continue only with mental health treatment, but she thereafter tested positive for THC. *Id*. at 9, 104-06.

Mother participated in parenting classes during her stay at Taylor Diversion, but the sessions closed without successful completion when Mother absconded. *Id*. at 107. Mother subsequently declined the re-referral for coached parenting in August 2022. *Id*. at 108-09.

As for her mental health treatment, she complied while at Taylor Diversion, but otherwise only resumed treatment as of June 2022, and has been inconsistent with attendance. *Id*. at 100-01, 103. Indeed, she did not submit to the ordered mental health evaluation until November 2022. *Id*. at 101.

Finally, with respect to the IPV concerns, a referral was made to the Women's Center and Shelter in March 2022. Mother spoke with the shelter but did not participate in their group program. *Id*. at 111-12. In May 2022, Mother threw herself in front of a car and was struck, following feelings of being overwhelmed and violence from P.J. *Id*. at 96-97. As recently as January 2023, P.J. was charged with simple assault and harassment, with Mother listed as the victim. *Id*. at 98. Mother maintains that her intentions are to remain in a committed relationship with P.J. and start a family together. *Id*. at 215.

Despite her recent engagement with services related to accomplishing her permanency goals, CYF testified that it remained concerned about her instability in housing, continued relationship with P.J., and inconsistent visitation with L.S. *Id*. at 103. Regarding visitation, Mother attended eighty-six of the 118 scheduled visits, which included only four of twelve scheduled since December 2022. *Id*. at 153-54. CYF acknowledged that Mother had made progress while in Taylor Diversion, but her progress deteriorated after leaving. *Id*. at 81-82, 95. In summary, the casework supervisor testified as follows:

> She showed stability while she was at Taylor Diversion and focused on the drug and alcohol, mental health, her education, overall well-being for herself and showed stability. Since that time I think she struggled with instability and impulsivity at times and hasn't been consistent as she hasn't been able to maintain herself in a consistent environment.

*Id*. at 122. According to CYF, they have had "the same concerns for the past three years" and Mother "continue[d] to put herself in situations that she hasn't been able to resolve[,]" such as "[t]he IPV incidents[ and] the lack of having [a] stable environment." *Id*. at 129.

It is evident from the certified record that Mother's main barrier to being able to care for L.S. has been "[h]er instability and inconsistency." *Id*. at 128. Moreover, she has failed to substantially comply with her court-ordered goals or remedy the causes leading to her incapacity. While we commend Mother for her recent progress and hope that she perseveres on that path,

> the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.

*In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006). Accordingly, the orphans' court did not abuse its discretion in finding statutory support for termination pursuant to § 2511(a)(5) as to L.S.

Finally, we turn to § 2511(b). Our Supreme Court has explained the requisite analysis as follows:

> [C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.
>
> Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests

- 12 -

and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.

Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The court must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*Int. of K.T.*, 296 A.3d 1085, 1105–06 (Pa. 2023) (cleaned up).

This Court has emphasized that "the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa.Super. 2010) (cleaned up). As a general matter, Pennsylvania does not require the orphans' court to enlist a formal bonding evaluation or base its needs and welfare analysis upon expert testimony. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2011). In weighing the bond considerations pursuant to § 2511(b), "courts must keep the ticking clock of childhood ever in mind." *In re T.S.M.*, 71 A.3d 251, 269 (Pa. 2013). "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id*. A court cannot "toll the well-being and permanency" of a child indefinitely in the hope that a parent "will summon the ability to handle the responsibilities of parenting." *In re C.L.G.*, 956 A.2d 999, 1007 (Pa.Super. 2008) (*en banc*) (citation omitted).

Mother argues that the record was "unclear that termination of Mother's parental rights would best serve the needs and welfare of L.S." Mother's brief at 20. She maintains they share a bond and that the evidence did not "prove that L.S. would be better off if Mother were removed from his life." *Id*. According to Mother, the orphans' court failed to make specific findings with regard to the § 2511(b) factors and thus it "is unclear as to how the court made its decision." *Id*. at 21.

Mother is correct that the orphans' court's analysis leaves much to be desired with respect to § 2511(b). *See* Orphans' Court Opinion, 5/18/23, at 9-10 (stating, without discussion, that the court "fully and completely considered the developmental, physical and emotional needs and welfare of L.S." and that, based thereon, termination was appropriate). Nonetheless, the court did consider the best interests of L.S. with regard to its analysis of § 2511(a)(5), therein focusing on L.S.'s need for permanency. *See id*. at 8.

Despite the paucity of the orphans' court's opinion, the certified record supports its conclusion that L.S. is best served by terminating the parental rights of Mother in anticipation of an adoption by his foster parents. Dr. Bernstein explained the relationship between L.S. and Mother "as more of a playmate-like relationship than so much a parent-child connection." N.T. Hearing, 3/3/23, at 26. He acknowledged that it was a positive relationship, and it was testified to more than once that L.S. refers to Mother as "Mommy

A."[6]  *Id*. at 26-27, 156.  However, L.S. also refers to his foster parents as "mom" and "dad," and they have been the ones who have ably tended to his medical needs and complex diet for the past three years.  *Id*. at 53-54, 125-26, 145, 150-51.  Indeed, he has looked to his foster parents for parental care for the majority of his life.  The certified record supports the conclusion that the foster parents have been the source of the intangibles such as "love, comfort, security, and stability" for L.S. over the past three years.  *See Int. of K.T.*, *supra* at 1106 (cleaned up).

Dr. Bernstein stressed the importance of permanency for L.S. at his age and opined that there would be no immediate detrimental impact on L.S. as a result of terminating Mother's parental rights.  *See* N.T. Hearing, 3/3/23, at 30-31.  Conversely, Dr. Bernstein posited that removing L.S. from his foster parents "could be traumatizing" as "he is relying upon them in all necessary ways for his everyday needs, not to mention he has relationships with them." *Id*. at 31.  Likewise, CYF suggested that termination would be in the best interests of L.S., noting that "his stability has been maintained in his foster home.  His medical needs have been met consistently.  And he, for all intents and purposes, does see the foster parents as his parents.  And [Mother] continues to be inconsistent and not consistently stable." *Id*. at 145.  Finally,

---

[6] We note that the "A." does not signify L.S. using the letter "A" but rather his Mother's first name.  We use the letter "A" in place of her name as we use initials for the parties within this memorandum.

L.S.'s counsel argued that "it would serve both his legal and best interests to terminate parental rights and to free him for adoption." *Id*. at 228. Therefore, the record supports the assessment of the orphan's court that the effect of legally severing the parental bond between Mother and L.S. will not result in detrimental effects on L.S.

Based on the foregoing, we affirm the order of the orphans' court terminating Mother's parental rights as to L.S.

Order affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

DATE:  11/15/2023